FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2006 MAR -2 PH 4:23

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DAVID A. CROUCHET** | **CIVIL ACTION** |
| **VERSUS** | **NO. 04-3496** |
| **JO ANNE B. BARNHART**<br>**COMMISSIONER OF SOCIAL**<br>**SECURITY ADMINISTRATION** | **SECTION "S" (3)** |

## REPORT AND RECOMMENDATION

Plaintiff brings an action pursuant to 42 U.S.C. § 405(g) appealing a final decision by the Commissioner of Social Security which denied his claim for Disability Insurance Benefits under the Social Security Act (42 U.S.C. § 400 et seq.). Now before the Court is plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. Having reviewed the parties' written submissions, the administrative record and the applicable law, the undersigned Magistrate Judge finds the there is substantial evidence in the record supporting the decision of the Commissioner, and thus, RECOMMENDS dismissal of the plaintiff's case with prejudice for the following written reasons.

## I. BACKGROUND

### A. Procedural History

Plaintiff David A. Crouchet filed an application for disability insurance benefits under Title II of the Social Security Act (the "Act") on February 27, 2002, alleging disability since

1

October 28, 2000.[1]   The Social Security Administration ("SSA") denied his application.[2]

Subsequently, plaintiff filed a timely request for a hearing before an Administrative Law Judge

("ALJ").[3]   On December 10, 2002, Crouchet accompanied by counsel and a vocational expert

(VE Crystal Younger), appeared before an ALJ.[4] In a decision dated January 30, 2003, the ALJ

found the plaintiff not disabled and denied his application.[5]   The ALJ's decision became final

when the Appeals Council declined to review it on October 29, 2004.[6]   Plaintiff then filed this

timely action for judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §

405(g).

## B. Factual Background

### 1. Plaintiff's Disability Claim

In his application for benefits, plaintiff alleged that he became disabled on October 28,

2000 due to vertigo, hearing loss and back pain.[7]   Plaintiff alleged that his combination of

impairments, including "chronic vertigo," lumbar disk disease at L3-4 and L4-5, foraminal

narrowing, radiculopathy affecting  his legs and prescription drug therapy, greatly affects his

---

[1]*See* Application for Disability Insurance Benefits dated February 27, 2002 [Adm. Rec. 83-85]; Disability Report dated February 27, 2002 [Adm. Rec. 87-96].

[2]*See* Disability Determination and Transmittal dated July 3, 2002 [Adm. Rec. 66]; Notice of Disapproved Claim dated July 8, 2002 [Adm. Rec. 67-71].

[3]*See* Request for Hearing by Administrative Law Judge dated July 31, 2002 [Adm. Rec. 72].

[4]*See* Transcript of December 10, 2002 Administrative Hearing [Adm. Rec. 29-65].

[5]*See* ALJ Mark R. Dawson's Decision dated January 30, 2003 [Adm. Rec. 21-27].

[6]*See* Notice of Appeals Council Action dated October 29, 2004 [Adm. Rec. 3-5].

[7]*See* Disability Report dated February 27, 2002 [Adm. Rec. 87-96].

concentration and makes it difficult for him to attend to any job duties.[8]  Crouchet reported that the onset of vertigo was sudden and that he began experiencing severe dizziness after a spinning ride in an amusement park in October of 2000.[9]

## 2. Plaintiff's Testimony

Plaintiff was born on November 18, 1953, and was 49 years old when he appeared before the ALJ.[10]  At the administrative hearing, plaintiff testified that he completed the twelfth grade and that he had been in the delivery business driving a truck since the 1980's.[11]  Plaintiff claimed that his vertigo commenced in October of 2000 and that he had completely stopped working in January of 2002.[12]  In addition to working as a delivery person, plaintiff also had licenses and vocational training in air conditioning, but that was more than fifteen years prior to the time of the hearing.[13]

Regarding his back condition, plaintiff testified that he had three disks and stenosis of the spine, which causes severe pain mainly in his right leg; however, he also experienced cramping and numbness in his lower legs and feet.[14]  Crouchet stated that his back problems were of traumatic origin, *i.e.*, he felt a strange sensation in his back when he was lifting a 120 pound box

---

[8]*See* Transcript of Administrative Hearing [Adm. Rec. 32-33].

[9]*See* Report of Dr. John F. Nitsche dated May 16, 2002 [Adm. Rec. 182].

[10]*Id.* [Adm. Rec. 33].

[11]*Id.* [Adm. Rec. 34-35].

[12]*Id.* [Adm. Rec. 35-36].

[13]*Id.* [Adm. Rec. 36].

[14]*Id.* [Adm. Rec. 37].

at work in May of 1987.  Plaintiff testified that he sustained a bulging disk and collected

workers' compensation for approximately 4 months.[15]  Crouchet stated that he cannot function at

all because of his back because he is afraid to do anything. He further explained that he has been

laid up for six weeks because his "back went out on him while he was sleeping."[16]  Plaintiff was

prescribed Vioxx, Percocet and Flexeril for his back pain. Dr. John Montz sees him every three

months and his prescription drug therapy is written to last for this period between appointments.[17]

Plaintiff also takes Ambien to help him sleep and Quinine to ease his leg cramps.

Crouchet testified that he no longer drives and that his back pain is constant (*i.e.*, he lives

in pain 24/7).  Plaintiff claimed that the pain precludes him from sitting more than forty-five

minutes or standing more than 30 minutes at a time; during an eight hour work day, plaintiff can

sit for no more than two hours and stand for no more than an hour in total.  Crouchet estimated

that he spent 60% of his waking hours lying down to keep the pressure off of his spine.  Plaintiff

also indicated that his medication causes the unpleasant side effect of diarrhea almost every

day.[18]

Addressing his vertigo, plaintiff testified that the dizziness causes him to fall down at

times and he must steady himself while ambulating.  Crouchet indicated that the vertigo has

progressively gotten worse and, when he awakens, he is totally disoriented.  Plaintiff's treating

physician, Dr. LeBlanc, prescribed physical therapy once a week for his dizziness.  Plaintiff

---

[15]*Id.* [Adm. Rec. 43].

[16]*Id.* [Adm. Rec. 44].

[17]*Id.* [Adm. Rec. 44].

[18]*Id.* [Adm. Rec. 47-48].

testified that he cannot work because the vertigo makes him nauseous, so much so that he cannot concentrate or stay focused. In sum, plaintiff indicated that he experiences dizziness to some degree all day.[19]

Addressing his hearing loss, plaintiff simply testified that he cannot hear as well with his left ear. As for his routine daily activities, Crouchet testified that he normally gets only about four hours sleep at night. Upon awakening, he helps his seven year old daughter get ready for school. Plaintiff testified that his wife does all of the cooking and that he may help with housework, but only occasionally, because he is afraid of hurting his back. Plaintiff does not drive and does no exercise. He helps his daughter with her homework in the afternoon, reads the sports section of the newspaper and watches television.[20]

### 3. Medical Evidence

Dr. John M. Cusco treated the plaintiff for lower back pain between January, 2000 through December, 2000.[21] On October 31, 2000, Crouchet presented for follow-up from hospital treatment for vertigo, which was then only minimal.[22] During this period, plaintiff was also was referred to River Parishes Hospital for a sleep study, which revealed moderate obstructive sleep hypopnea. No further treatment was indicated at that time.[23]

---

[19]*Id.* [Adm. Rec. 42-42].

[20]*Id.* [Adm. Rec. 49-50].

[21]*See* Treatment Records of Dr. John M. Cusco [Adm. Rec. 129-132].

[22]*Id.* [Adm. Rec. 122].

[23]*See* Sleep Study Interpretation dated April 10, 2000 [Adm. Rec. 139-140].

On March 19, 2001, Crouchet saw Dr. Damaris Gautier for lower back pain, lower leg cramps, stomach cramps and "fluid in ears." Dr. Gautier noted plaintiff's past medical history, including "ulcer per EGD (1997), vertigo (2000) and bulging or ruptured intervetebral disk."[24] Dr. Gautier further noted that plaintiff's medications included Vioxx (pain), Ambien (sleep), Prevacid (stomach cramps) and Quinine Sulfate (leg cramps).[25] On initial exam, Dr. Gautier found fluid in the left ear and paravertebral muscle tenderness.[26]

Regarding the plaintiff's stomach cramps/bloody stools, Dr. Gautier ordered an ultrasound of the lower abdomen, which revealed a hypoechoic hepatic focus and a small simple renal cortical cyst.[27] Upon further workup as suggested via CT Scan, there was a suggestion of a low-attenuation lesion in the high right portion of the right liver lobe, which was not detected either during or after the administration of intravenous contrast.

Dr. Gautier's medical records reveal that plaintiff continued to complain of lower lumbar pain, "fluid in ears," and dizziness.[28] Dr. Gautier referred the plaintiff to Dr. Bryce J. LeBlanc, Jr., an ENT (ear, nose and throat specialist), who ordered that various tests be performed,

---

[24]*See* Evaluation and Management History Form dated March 19, 2001 [Adm. Rec. 159-160].

[25]*Id.* [Adm. Rec. 160].

[26]*See* Result of Neurologic Physical Examination dated March 19, 2001 [Adm. Rec. 161].

[27]*See* Report of Ultrasound Examination of the Abdomen dated March 22, 2001 [Adm. Rec. 37-39].

[28]*See* Dr. Gautier's Progress Notes dated March 23, 2001 (diagnosing "serious otitis - cont[inue] Zyrtec") [Adm. Rec. 156]; Progress Notes dated April 20, 2001 (diagnosing "otitis media" and abdominal pain) [Adm. Rec. 155]; Progress Notes dated May 8, 2001 (diagnosing otitis media and prescribing Medrol Dose Pack and abdominal workup) [Adm. Rec. 154]; Progress Notes dated June 26, 2001 (serious otitis) [Adm. Rec. 152].

including an MRI, Audiologic testing and an ENG.

ENG testing revealed a mixed central and peripheral finding.[29]  Dr. LeBlanc diagnosed

peripheral vertigo and prescribed vestibular therapy.[30]  The January 11, 2002 report  MRI of the

brain and internal auditory canals revealed: (1) anatomic variant of a giant cisterna magnum; (2)

anatomic variant of right-sided vertebral artery dominance; and (3) subtle mucosal thickening of

ethmoid air cells.[31]

Dr. Peter Rigby of LSU Medical Center examined Crouchet on February 13, 2002.  His

findings included bilateral arytenoiditis of the larynx consistent with GE reflux, left pitting

nsytagmus with left gaze (but not on the right), mildly positive Romberg, and Tandem Romberg[32]

positive bilaterally.[33]  Dr. Rigby reviewed plaintiff's MRI results and noted:

> There appears to be a space-occupying CSF-filled lesion in the area posterior to
> the cerebellum.  This is in the area of the magna cisterna.  This lesion appears to
> press against the vermis and also against the primary ocular cortex.[34]

His diagnoses were GERD, Arachnoid cyst, Central Vertigo and Allergic Rhinitis and he

---

[29]*See* Report of Dr. Bryce LeBlanc dated December 6 2002 [Adm. Rec. 214]; ENG
Worksheet dated January 8, 2002 [Adm. Rec. 223].

[30]*See* Referral dated November 7, 2002 [Adm. Rec. 202].

[31]*See* Report of MRI of Brain and Internal Auditory Canals dated January 14, 2002 [Adm.
Rec. 200, 221].

[32]"Romberg's sign" is defined as "a sign for loss of position sense in which the patient
cannot maintain equilibrium when standing with feet together and eyes closed." *See Blackiston's*
Gould Medical Dictionary at p. 1202 (4th Ed.).

[33]*See* Report of Dr. Peter Rigby dated February 13, 2002 [Adm. Rec. 219-220].

[34]*Id.* [Adm. Rec. 220].

recommended that a neurosurgeon further evaluate the patient's MRI scan.[35]

The February 18, 2002 clinic note of neurosurgeon, Lucien S. Miranne, reiterated the

plaintiff's medical history, to wit:

> Mr. Crouched is a 48-year-old male with a history of vertigo. This happened
> while he was riding on a ride in Jazzland in November of 20000. He had a
> sudden onset of vertiginous symptomotology associated with sweating and a quite
> ill and sick feeling. He has gotten better through the past year or so. He notes
> occasional dysfunction. He denies any headaches or other neurologic
> symptomatology. He does note some vision changes, but possibly needs to
> change his vision correction, but denies any diplopia.[36]

Dr. Miranne further noted that he reviewed the aforesaid MRI scan of the brain and internal

auditory canals, which he described as "basically normal."[37] Dr. Miranne cited the same

anatomic variants previously described by Dr. Rigby, reported absolutely no mass affect

associated with said anatomic variants and concluded that "[t]here is certainly nothing to base the

symptomatology on [the patient's] MRI scan."[38] Dr. Miranne's impression was "[v]ertigo

possibly related to the ride at Jazzland, which possibly dislodged a[n] otolith,[39] which would

certainly cause this symptomatology."[40] Crouchet was advised to follow up with Dr. LeBlanc.[41]

On May 16, 2002, Dr. John Nitsche performed a consultative examination of the plaintiff,

---

[35]*Id.*

[36]*See* Report of Dr. Lucien Miranne dated February 18, 2002 [Adm. Rec. 218].

[37]*See* Report of Dr. Lucien Miranne dated February 18, 2002 [Adm. Rec. 197, 218].

[38]*Id.*

[39]"Otolith" is defined as "[o]ne of the calcareous concretions within the membranous
labyrinth of the ear...." *See Blakiston's* Gould Medical Dictionary at p.967 (4th Ed.).

[40]*See* Report of Dr. Lucien Miranne dated February 18, 2002 [Adm. Rec. 197, 218].

[41]*Id.*

who reported that his major problems were: (1) chronic low back pain radiating down to the posterior aspect of the left leg and left foot which is aggravated by standing, walking, bending and lifting and controlled by taking Percocet; and (2) disturbance of special senses, *i.e.*, daily episodes of nausea, dizziness and feeling "off balance."[42]  Dr. Nitsche noted that the plaintiff was prescribed Meclizine for dizziness but he uses it only once a month because it causes fatigue and, at times, increased dizziness.  Although plaintiff complained of impaired hearing (more on the left than the right), Dr. Nitsche noted that Crouchet did not wear a hearing aid.  He further noted that the plaintiff's sight was corrected with glasses and that his speech was normal.[43]  The examination revealed that all systems were normal.[44]

Dr. Nitsche performed a neurological examination which revealed normal muscle strength in both upper and lower extremities and normal muscle tone with no evidence of atrophy or abnormal muscle movements.  Plaintiff's sensation was normal in both upper and lower extremities and his cerebellar function was normal.  Examination of the cervical spine revealed normal range of motion.  Active flexion of the lumbar spine was from 0 to 80 degrees (0 to 90 degrees is normal flexion).  Extension of the lumbar spine was from 0 to 20 degrees (0 to 30 degrees is normal).  Plaintiff did complain of tenderness to palpation about the lower lumbar region; however, there was no localized spasm and straight leg testing was negative.  Additionally, there was full range of motion of all peripheral joints and no joint swelling, redness or increased warmth over any joint.  His functional assessment was completely normal, including

---

[42]*See* Report of Dr. John Nitsche dated May 16, 2002 [Adm. Rec. 182].

[43]*Id.*

[44]*Id.* [Adm. Rec. 184].

pushing, pulling, reaching, sitting, standing and gait. Dr. Nitsche further noted that heel/toe walking was normal and that balancing when walking was adequate. Crouchet did not use any ambulatory device and he climbed on and off the examination table independently. Dr. Nitsche's impression was episodic dizziness and chronic low back sprain and that plaintiff would only find it difficult to perform "heavy physical work."[45]

Dr. John R. Montz treated plaintiff for chronic lumbar pain. His treatment notes dated November 11, 2002 note that the plaintiff continues to have back discomfort and periodic pain in the right lower extremity. Dr. Montz specifically notes that Crouchet "demonstrates a functional lumbar motion with mild discomfort" and that "there is mild tenderness and no definite spasm."[46] Dr. Montz further noted that his motor and sensory examination of the plaintiff was normal and that "[s]traight leg raise causes back discomfort only."[47]

> Addressing the plaintiff's MRI test results dated October 9, 2002, Dr. Montz reported: MRI demonstrates bulging at L2-3, 3-4 and 4-5. At 4-5 there is foraminal narrowing particularly on the right on review of the films.[48]

Dr. Montz indicated that the plaintiff may need medication refills in the future and Crouchet was instructed to return in three months.[49]

Dr. LeBlanc completed a Residual Functional Capacity Evaluation dated January 3, 2003, diagnosing "inner ear disturbance" and further noting that the "[p]atient complained of loss of

---

[45]See Dr. Nitsche's Report dated May 16, 2002 [Adm. Rec. 184-185].

[46]See Dr. John R. Montz's Clinic Notes dated November 11, 2002 [Adm. Rec. 207].

[47]Id.

[48]Id.

[49]Id.

balance – not true vertigo."[50]  He further reported that the plaintiff does not have Meniere's

Disease, Vertigo or progressive hearing loss, but that he does have "a history of frequent attacks

of balance disturbance," and Tinnitus ("very infrequently").  When asked to identify the

symptoms associated with the plaintiff's condition, plaintiff's treating physician noted "only loss

of balance."[51] Addressing the frequency of the symptom, Dr. LeBlanc noted that the loss of

balance "occurs off and on – not on a regular basis."[52]  He further indicated that a precipitating

factor was "sudden movement," moving around may make an attack of loss of balance worse and

that avoiding movement will improve the symptom.  Regarding workplace limitations, Dr.

Leblanc opined that plaintiff would sometimes need to take unscheduled breaks and, on occasion

depending on the severity of the balance problem, he could be precluded from performing even

basic work.  Dr. LeBlanc further noted that the plaintiff needed to take precautions to avoid

hurting himself if he experiences a loss of balance attack.[53]

## II. STANDARD OF REVIEW

The function of the court on judicial review of a denial of benefits is to determine

whether "substantial evidence" supports the final decision and whether the Commissioner used

the proper legal standards to evaluate the evidence.[54]  If the Commissioner's findings are

---

[50]*See* Section 232.1 Vertigo/Meniere's Disease Residual Functional Capacity Evaluation Questionnaire dated January 3, 2003 [Adm. Rec. 229-232].

[51]*Id.* [Adm. Rec. 230].

[52]*Id.*

[53]*Id.* [Adm. Rec. 231-232].

[54]42 U.S.C. § 405(g); *Newton v. Apfel,* 209 F.3d 448, 452 (5th Cir. 2000); *Brown v. Apfel,* 192 F.3d 492, 496 (5th Cir. 1999).

supported by substantial evidence, they must be affirmed.[55]  "Substantial evidence" is more than

a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion.[56]   A district court may not try the issues *de novo*, re-

weigh the evidence or substitute its own judgment for that of the Commissioner, even if the

district judge believes that the evidence weighs against the Commissioner's decision.[57]

Nevertheless, the Court must carefully scrutinize the entire record to determine whether

substantial evidence exists to support the ALJ's findings.[58]  Nevertheless, "conflicts in the

evidence are for the Commissioner and not for the courts to resolve."[59]

    If proper principles of law were applied, and if the Commissioner's decision is supported

by substantial evidence, the findings are conclusive and must be affirmed.[60]

### III. DISCUSSION

### A. The ALJ's Decision

    To qualify for Social Security income or disability insurance benefits, the plaintiff must

meet the requirements set forth in the Social Security Act.[61]  Specifically, the plaintiff must be

---

[55]*Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir. 2002); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[56]*Richardson v. Perales,* 402 U.S. 389, 401 (1971); *Boyd v. Apfel*, 239 F.3d  698, 704 (5th Cir. 2001); *Newton,* 209 F.3d at 452.

[57]*Masterson,* 309 F.3d at 272; *Newton,* 209 F.3d at 452.

[58]*Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied,* 514 U.S. 1120 (1995); *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992).

[59]*Masterson*, 309 F.3d at 272 (citations and internal alterations omitted).

[60]*See id.* (*citing Richardson,* 402 U.S. at 401)

[61]*See* 42 U.S.C. § 423(a) (2001).

under age 65, file an application for benefits and be under a disability as defined by the Act.[62]

Those claiming disability insurance benefits under the Act have the burden of showing the

existence of disability. "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which ...

has lasted or can be expected to last for a continuous period of not less than 12 months."[63]

Establishment of "disability" is a dual process. First, the claimant must prove that he suffers

from a medically determinable impairment.[64] Second, the claimant must prove that his

impairment or combination of impairments render him unable to engage either in the work he

previously performed or other substantial gainful employment that exists in the national

economy.[65]

The Commissioner utilizes a five-step sequential evaluation to aid in the determination of

whether a claimant is disabled.[66] A finding that the claimant is not disabled at any step is

conclusive and ends the inquiry.[67] The five-step analysis was cogently restated in *Shave v. Apfel*:

> First, the claimant must not be presently working at any substantial gainful
> activity. Second, the claimant must have an impairment or combination of
> impairments that are severe. An impairment or combination of impairments is
> "severe" if it "significantly limits [a claimant's] physical or mental ability to do
> basic work activities." Third, the claimant's impairment must meet or equal an

---

[62]*See* 42 U.S.C. §§ 416(I), 423(a) (2001).

[63]42 U.S.C. § 423(d)(1)(A) (2001).

[64]42 U.S.C. §§ 416(I)(1), 423(d)(1)(A) (2001).

[65]42 U.S.C. §§ 416(I)(1), 423(d)(2) (2001).

[66]*Newton,* 209 F.3d at 453 (5th Cir. 2000).

[67]*Watson,* 309 F.3d at 272; *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).

impairment listed in the appendix to the regulations. Fourth, the impairment must prevent the claimant from returning to his past relevant work. Fifth, the impairment must prevent the claimant doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience. At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant acquits this responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. If the Commissioner meets this burden, the claimant must then prove he in fact cannot perform the alternate work.[68]

In conjunction with steps four and five, the Commissioner utilizes a "residual functional capacity (RFC) assessment to determine whether the applicant, notwithstanding severe impairment, has the physical and mental ability to perform work-related activities on a regular and continuing basis as is generally required by competitive, remunerative work.[69] Thereafter, the Commissioner determines if the claimant has the physical and mental ability to perform her past relevant work.[70] If the claimant's RFC meets or exceeds the requirements of her regular previous employment, the disability claim is denied.[71] If not, the inquiry proceeds to step 5 where the Commissioner has the burden to show that the claimant can do work as it is generally performed in the national economy.[72]

---

[68]*Shave v. Apfel*, 238 F.3d 592, 593 (5th Cir. 2001).

[69]RFC is defined as "what you can still do despite your limitations" and has three components, to wit: physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(a) (2002); Soc. Sec. Ruling 96-8p, 61 F.R. 34474 (July 2, 1996).

[70]*See Chaparro v. Bowen,* 815 F.2d 1008, 1010 (5th Cir. 1987).

[71]*See* 20 C.F.R. § 404.1561 (2002).

[72]*See* 20 C.F.R. § 404.1566 (2002).

14

In the instant case, there is no disagreement concerning the first four steps of the analysis. First, the ALJ found that plaintiff had not been engaged in substantial gainful activity since October 28, 2000. Second, the ALJ concluded that plaintiff suffers from a chronic lumbar strain and mixed central and peripheral vertigo which significantly limits the claimant's ability to work, and which were deemed "severe" within the meaning of the regulations. Third, the ALJ found that the plaintiff did not suffer from any condition that meets or equals the conditions outlined in the Listings. Fourth, the ALJ determined that the plaintiff is unable to perform any of his past relevant work as warehouseman, delivery driver and truck driver due to the aforesaid conditions.[73] And finally, the ALJ found that plaintiff, at all relevant times, was capable of performing a "significant range of light work" and that there are a significant number of jobs in the national economy that plaintiff can perform.[74]   The ALJ further found that:

> Although the claimant's exertional impairments do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.21 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a handpacker and assembler.[75]

The ALJ thereby concluded that plaintiff was not disabled under the Act.

### B. Residual Functional Capacity -RFC

Plaintiff contends that substantial evidence does not support the ALJ's RFC determination that the plaintiff could perform light work. Plaintiff argues that despite new evidence concerning the plaintiff's impairments, including the statement of the plaintiff's treating

---

[73]*See* ALJ Mark Dawson's Decision dated January 30, 2003 [Adm. Rec. 22-27].

[74]*Id.* [Adm. Rec. 25

[75]*Id.* [Adm. Rec. 25-27].

physician Dr. LeBlanc, the ALJ improperly relied on the report of Dr. Nitsche which is deficient in several areas. In this regard, plaintiff argues that no records were provided to Dr. Nitsche. Additionally, plaintiff contends that more specialized (neurological) tests should have been administered to determine whether there were any limitations associated with vertigo. More specifically, plaintiff notes that there is no indication that the "Dix-Hallpike test" was performed to determine whether vertigo was triggered by certain head movements. In summary, plaintiff contends that, had the ALJ properly weighed the evidence and incorporated Dr. LeBlanc's opinion, more restrictive limitations would have resulted.

The ALJ must follow the Guidelines set forth in 96-2p to determine whether "controlling weight" should be given medical opinions of a "treating source." These guidelines are that: (1) the opinion must come from a "treating source;" (2) the opinion must be a "medical opinion;" (3) the treating source's medical opinion must be "well supported" by "medically acceptable" clinical and laboratory techniques; and (4) even if supported, the opinion must not be inconsistent with other substantial evidence. Even if the ALJ finds that the treating source's medical opinion is not entitled to controlling weight, that does not mean that the opinion can be rejected. "Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927."[76]

The factors provided in 20 C.F.R. 404.1527 and 416.927 include: (1) Examining relationship; (2) Treatment relationship, length of treatment, frequency of examination, nature and extent of relationship; (3) Supportability; (4) Consistency; and (5) Specialization. "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts

---

[76]SSR 92-2p.

16

where the treating physician's evidence is conclusory, is unsupported by medically acceptable

clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence."[77]

Medical opinions of a specialist are generally accorded more weight than opinions of a source

not a specialist.[78]  However, specialization is only one of several factors considered in the

evaluation of medical opinions.  In summary, the Commissioner has considerable discretion in

assigning weight to medical opinions and is free to reject the opinion of any physician when

substantial evidence supports a contrary conclusion.[79]

In this case, the ALJ discussed the relevant evidence, which is reiterated above in greater

detail.  ALJ Dawson considered the plaintiff's subjective complaints and found them generally

not credible in light of the medical evidence.  The ALJ did not give credence to plaintiff's

testimony that he had to lie down approximately 60% of time during the day.  The Commissioner

aptly points out that plaintiff never reported to his treating physicians that his medical conditions

had totally incapacitated him.  The ALJ complied with the requirements of SSR 96-7p and the

credibility determination should not be disturbed as it is not patently wrong.  The ALJ explained:

> In reaching this conclusion [that the plaintiff is capable of light work with certain
> restrictions consistent with episodic dizziness], the undersigned has considered
> the claimant's own subjective allegations and has found them generally not
> credible in light of the medical evidence of record. (Social Security Ruling 96-7p)
> The claimant testified to having to lie down about 60 percent of the time,
> secondary to dizziness and back pain.  Treatment reports show that the claimant
> never discussed with physicians that he was almost completely incapacitated by

---

[77]*Shave v. Apfel,* 238 F.3d at 595 (5th Cir. 2001); *Newton v. Apfel,* 209 F.3d 448, 456 (5th Cir. 2000).

[78]*Moore* v. *Sullivan,* 919 F.2d 901, 904 (5th Cir. 1990).

[79]*Greenspan,* 38 F.3d at 237; *Martinez v. Chater,* 64 F.3d 172, 176 (5th Cir. 1995); *Spellman,* 1 F.3d at 364; *Moore v. Sullivan,* 919 F.2d at 905.

these conditions. In addition, objective evidence shows minimal functional limitation to the spine and no showing of an inability to ambulate effectively, secondary to dizziness.[80]

As to plaintiff's back condition, the assessment by Dr. Montz ( plaintiff's treating orthopedic surgeon) parallels that of the consulting examiner, Dr. Nitsche (Internist with a subspecialty in Rheumatology). Dr. Montz noted that Crouchet demonstrates functional lumbar motion with mild discomfort and only mild tenderness and no definite spasm."[81] Dr. Montz further noted that his motor and sensory examination of the plaintiff was normal and that straight leg raising yielded back discomfort only.[82] Although Dr. Montz reported that plaintiff's MRI demonstrated bulging at L2-3, L3-4 and L4-5, he further opined that plaintiff was doing satisfactorily and may need medication refills; therefore, plaintiff was instructed to return in three months.[83]

Dr. LeBlanc, plaintiff's treating specialist (ENT), completed a Residual Functional Capacity Evaluation dated January 3, 2003, diagnosing "inner ear disturbance" and further noting that the "[p]atient complained of loss of balance – not true vertigo."[84] He further reported that the plaintiff does not have Meniere's Disease, Vertigo or progressive hearing loss, but that he

---

[80]ALJ Dawson's Decision dated January 30, 2003 [Adm. Rec. 24].

[81]*See* Dr. John R. Montz's Clinic Notes dated November 11, 2002 [Adm. Rec. 207]. *See also* Dr. Lucien Miranne's Report dated February 18, 2002 (noting full range of motion and no tenderness in cervical and lumbar spine, motor/strength/sensation/reflexes/gait normal and negative Romberg) [Adm. Rec. 218].

[82]*See* Dr. John R. Montz's Clinic Notes dated November 11, 2002 [Adm. Rec. 207].

[83]*Id.*

[84]*See* Section 232.1 Vertigo/Meniere's Disease Residual Functional Capacity Evaluation Questionnaire dated January 3, 2003 [Adm. Rec. 229-232].

does have "*a history* of frequent attacks of balance disturbance," and Tinnitus ("very infrequently"). The only symptom associated with the inner ear disturbance at that time was loss of balance."[85] Addressing the frequency of the symptom, Dr. LeBlanc was unable to say whether the plaintiff's symptoms would cause him to be absent from work and/or with what frequency. Dr. LeBlanc's opinion was simply that Crouchet needed to take precautions not to hurt himself if he experienced a balance attack at work. He further opined that "sudden movement" was a precipitating factor of the plaintiff's "balance problem." Dr. LeBlanc did not say that the plaintiff was incapable of remunerative work at any level of exertion.

The Court is not persuaded by the plaintiff's argument that Dr. LeBlanc's opinion should have swayed the ALJ toward a determination of profound impairment due to vertigo. The plaintiff's complaint of completely debilitating symptoms are not supported by Dr. LeBlanc's records/report or the medical evidence as a whole. The ALJ acknowledged the plaintiff's impairments (*i.e.*, "severe" mixed central and peripheral vertigo and lumbar strain), but further determined that the plaintiff does not suffer from "disabling" impairments. The ALJ was within his discretion in assigning lesser weight to subjective complaints of pain by the applicant for disability insurance benefits, even though the applicant had medically determinable impairments which reasonably could have been expected to produce alleged symptoms. The medical and other evidence of record do not support the level of severity alleged by plaintiff. The ALJ articulated specific reasons for assigning lesser weight to Crouchet's subjective complaints. The ALJ's reasoning is supported by the record as a whole, governing case law and agency guidelines as ALJ Dawson articulated in his reasons for the credibility determination. 42 U.S.C.A. §§

---

[85]*Id.* [Adm. Rec. 230].

416(l), 423; 20 C.F.R. § 404.1563(e), 404.1568(d)(4). Accordingly, the ALJ's credibility

determination is supported by substantial evidence.

The Court now turns to the plaintiff's claim that the ALJ improperly determined that the

plaintiff could perform light work without consulting a medical advisor. A medical advisor is a

neutral advisor who renders expert opinion based solely on medical records and evidence.[86]   A

medical advisor generally is a board-certified specialist that explains or clarifies information for

an ALJ.[87]   Under applicable regulations, an ALJ must utilize a medical advisor only in certain

instances when it is unclear as to whether a claimant's impairments are equivalent in severity to

impairments in the Listings,[88] and when establishing the onset date of disability for slowly

progressive impairments.[89]   Otherwise, the ALJ does not have a duty to seek the opinion of a

medical advisor at any time during the five-step sequential analysis.[90]

---

[86]*See Richardson v. Perales*, 402 U.S. at 408 (1971); 20 C.F.R. §§ 404.1512(b)(6), 404.1527(f).

[87]*See Richardson*, 402 U.S. at 408.

[88]An ALJ must seek the opinion of a medical advisor when (1) The ALJ concludes that the claimant does not meet the specific criteria outlined in the Listings but reasonably believes claimant's impairments may be judged equivalent or; (2) If an ALJ receives additional medical evidence that he believes may change the "State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairments in the Listings. SSR 96-6p, 61 F.R. 34466, 34468 (July 2, 1996).

[89]The opinion of a medical advisor is required in cases involving slowly progressive impairments in which the date the claimant became "disabled" is ambiguous. In such instances, the ALJ may infer the date of a claimant's disability, but only with the assistance of a medical advisor. *Spellman v. Shalala*, 1 F.3d 357, 363-363 (5th Cir.1993); SSR 83-20, 1983 WL 31249 at 3 (1983).

[90]*See Richardson*, 402 U.S. at 408 (recognizing that medical advisors could, but were not required to be used in explaining complex medical problems to the examiner) (emphasis added); *Haywood v. Sullivan*, 888 F.2d at 1467 ("An ALJ requests a MA [medical advisor] to testify

Plaintiff here does not argue that a medical advisor was necessary to determine the onset date of disability. Plaintiff does not argue that either of his conditions required the assistance of a medical advisor at Step 3 of the sequential evaluation process. Rather, to the extent plaintiff argues at all, it is generally that ALJ Dawson should have relied on a medical advisor in making his residual functional capacity assessment. Whatever might be argued about the advisability of getting such assistance, one cannot successfully argue that the failure to obtain a medical advisor's testimony constitutes error. Consequently, this point lacks merit.

This Court accepts the factual findings of the ALJ, especially with respect to resolving conflicts in medical testimony. The Fifth Circuit has consistently held that the ALJ is responsible for determining credibility and resolving conflicts in medical testimony.[91] The fifth step in the sequential inquiry above requires the ALJ to determine the plaintiff's RFC, *i.e.*, whether the plaintiff is capable of performing other work, which exists in substantial numbers in the national economy, despite any limitations caused by plaintiff's condition. In determining the plaintiff's RFC, an ALJ must consider plaintiff's age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); see also 20 C.F.R. 404.1520(e)-(f).

In this case, the ALJ found that plaintiff was forty-nine years of age, with a high school education and past work experience as a warehouseman and a truck driver. Relying on VE testimony and the Grids as a framework, ALJ Dawson determined that the plaintiff had the

---

when she or he feels it necessary.")

[91] *See Masterson v. Barnhart*, 309 F.3d 267, 272 (5thCir.2002) (stating that the ALJ has the responsibility to resolve questions of credibility and questions arising from conflicting medical opinions).

residual functional capacity to perform a significant range of light work.[92]  The ALJ posed the

following hypothetical question to the ALJ, to wit:

> Let's assume for the purposes of this hypothetical that I find Claimant is 49 years
> of age.  That's a younger individual; that the claimant has completed a high school
> diploma.  That the Claimant has prior medium ... semi skilled work that you have
> described.  And then assume for the purpose of this hypothetical [that] I find the
> Claimant could perform a limited range of light work.  And there would be some
> of the following  limitations on that range of light work as follows.  First, that the
> Claimant would essentially be subject to seizure precautions, or one similar to that
> having to do with working at heights or around hazardous machinery or driving,
> and that sort of thing would not be available.  That ... he would have some
> [postural] limitations [of no] more than occasional kneeling, stooping, that sort of
> thing.  That he could not perform a job that would require entirely normal hearing
> as apparently he [Claimant] has some a somewhat diminished hearing capacity,
> best described as moderate; but he is apparently able to understand ordinary
> conversational speech.  Probably, you know, particularly so if it's not an unusually
> noisy environment.  And lastly, a moderate limitation in ability to concentrate
> such that he could not perform work which would require him to concentrate for
> extended periods of time without a break.  Now I'm assuming that under this
> hypothetical there's not prior work he could work. ...
> * * *
> [E]xclusive of any prior work or closely related work what other sorts of jobs are

---

[92]  The ALJ found:
Light work involves lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds.  Even though the weight lifted
may be very little, a job is in this category when it requires a good deal of walking
or standing, or when it involves sitting most of the time with some pushing and
pulling of arm or leg controls.  To be considered capable of performing a full or
wide range of light work, an individual must have the ability to do all of these
activities.  If someone can do light work, we determine that he can also do
sedentary work, unless there are additional limiting factors such as loss of fine
dexterity or inability to sit for long periods.

The claimant's ability to perform all or substantially all of the requirements of
light work is impeded by additional mental, postural and environmental
limitations.  For this reason, an impartial vocational expert was used to help
determine whether or not there are a significant number of jobs in the national
economy that the claimant can perform, given his residual functional capacity and
other vocational factors.
ALJ Dawson's Decision dated January 30, 2003 [Adm. Rec. 25].

there in the economy that such a Claimant might perform [under the current hypothetical].[93]

VE Younger testified as follows, to wit: (1) Assembler [SVP 3 or less]/ Louisiana 915 sedentary and 4,194 light duty/United States 160,896 sedentary and 440,000 light duty; (2) Guard/ Louisiana 5,113 light duty <20%>/United States 328,200 light duty <20%>; (3) Parking Lot Attendant/Louisiana 558 light duty/United States 51,442 light duty; and (4) Handpacker/ Louisiana 72 sedentary and 1,809 light duty/United States 7,186 sedentary and 230,642 light duty.[94] Based on the aforesaid testimony of the vocational expert, the ALJ concluded that, "considering the claimant's age, educational background, work experience and residual functional capacity, he is capable of making a successful adjustment to work that exists in significant numbers in the national economy."[95]

Turning to the allegation that the ALJ failed to include all of the plaintiff's impairments, plaintiff relies on the Fifth Circuit's decision in *Boyd v. Apfel*, 239 F.3d 698 (5th Cir. 2001). In *Boyd*, the court found reversible error because the limitations described in a post-hearing report were not incorporated into the hypothetical questions posed by the ALJ.

The law of the Fifth Circuit is that an ALJ may properly rely on the testimony of a vocational expert in determining that a claimant can perform other work if the hypothetical posed to the vocational expert incorporates reasonably all disabilities *recognized by the ALJ*, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's

---

[93]Transcript of Hearing Testimony [Adm. Rec. 54-55].

[94]*See* ALJ Dawson's Decision [Adm. Rec. 26]; Transcript of Hearing Testimony [Adm. Rec. 55-56].

[95]ALJ Dawson's Decision [Adm. Rec. 26].

question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical.[96]  Plaintiff argues that the vocational expert's testimony was not reliable because it did not include the limitation that plaintiff constantly experienced vertigo (*i.e.*, totally incapacitating bouts of dizziness on a regular/daily basis).  However, the medical records *in toto* and reports of Dr. LeBlanc in particular do not support the alleged severity of plaintiff's balance problem.  According to Dr. LeBlanc, plaintiff experienced episodes of imbalance and this impairment was precipitated by sudden movement.   In the event such an episode did occur, it was Dr. LeBlanc's opinion that plaintiff may need to take an unscheduled break.

Additionally, in response to questions posed by plaintiff's counsel, the VE testified that, even if the plaintiff experienced bouts on a daily basis where he was incapacitated for an hour during an eight hour day, that would affect some of the jobs that she found that the plaintiff could perform, but not all of them.[97]   The ALJ acknowledged only a *moderate* limitation in the plaintiff's ability to concentrate for extended periods of time without a break due to vertigo and rejected plaintiff's testimony regarding the severity of his condition.  The ALJ specifically acknowledged that there is no medical evidence which would support plaintiff's assertion that his medical conditions are totally incapacitating.[98]  Dr. LeBlanc's report dated January 3, 2003 does not support plaintiff's testimony that he experienced vertigo constantly or on any regular basis. Moreover, consistent with *Boyd*, Crouchet  was given an opportunity to cross-examine the

---

[96]*Boyd v. Apfel*, 239 F.3d 698, 706-07 (5th Cir.2001).

[97]*See* Transcript of Hearing [Adm. Rec. 59-61].

[98]*See* ALJ Dawson's Decision (noting that treatment reports show that claimant never discussed with his physicians that he was almost completely incapacitated by these conditions) [Adm. Rec. 24].

vocational expert and introduce more than moderate limitations into the hypothetical, *i.e.*, limitations which were not credited by the ALJ.  Crouchet's argument fails because "not all 'severe' impairments are disabling."[99]

Although the ALJ has a duty to fully develop the facts, the claimant has the burden of proving his disability.[100]  Crouchet did not meet that burden. The determination that Crouchet retains the ability to do light work, which includes work at the sedentary level, is supported by the credible testimony of the vocational expert and the medical evidence.

Finally, plaintiff argues that the ALJ erred in finding that he could perform skilled jobs and by including only semi-skilled positions (handpacker and assembler) in the "findings" section of his decision.  Essentially, plaintiff alleges error because the ALJ failed to incorporate all of the jobs identified by the VE in the findings section of his opinion, although all were listed in the body of the ALJ's opinion and two were mentioned in the findings *as examples* of the work that plaintiff could perform.  The Commissioner contends that, if this case were ultimately remanded so that the ALJ could list all of the jobs under the findings section of his opinion, the result would be the same.

The Commissioner correctly notes that the standard of review is not merely whether the ALJ committed error, but whether the error justifies remand.  This Court will not reverse the ALJ's decision unless Crouchet can show that he was prejudiced by such error.[101]  To establish

---

[99]*Harrell v. Bowen*, 862 F.2d 471, 479 (5th Cir.1988); *Shipley v. Secretary*, 812 F.2d 934, 935 (5th Cir.1987).

[100]*Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir.1995).

[101]*See Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir.2000).

prejudice, Crouchet must demonstrate that the error alleged might alter the result and he has failed in this regard. The vocational expert testified that plaintiff could perform the jobs of handpacker, assembler, guard and parking lot attendant. The vocational expert clarified that these were unskilled jobs, *i.e.*, SVP 3 or less, and that Crouchet had a high school diploma and would be expected to be able to perform up to SVP 3 level work, whether he had any transferable skills or not.[102]   Given the record before the court, Crouchet has not shown that he was prejudiced by the ALJ's findings.

The ultimate goal is determining, as this Court has, that there is substantial evidence supporting the ALJ's decision.[103]   Accordingly, the plaintiff's claims of error are without merit.

## IV. CONCLUSION

Plaintiff's points of error fail to show either that the ALJ applied improper standards of law or that the decision is not supported by substantial evidence, either because it was based on a defective hypothetical question or otherwise. Accordingly, IT IS RECOMMENDED that the Commissioner's decision be AFFIRMED and that the plaintiff's complaint be DISMISSED WITH PREJUDICE.

## V. OBJECTIONS

Objections must be: (1) specific, (2) in writing, and (3) served within ten days after being served with a copy of this report. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 1(a), 6(b) and 72(b) A party's failure to object bars that party from: (1) entitlement to *de novo* review by a district judge; and (2) appellate review of the unobjected-to factual findings and legal conclusions

---

[102]Transcript of Hearing [Adm. Rec. 57-58].

[103]*Carey v. Apfel,* 230 F.3d 131, 147 (5th Cir. 2000).

26

accepted by the district court, except upon grounds of plain error. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this  2nd  day of March, 2006.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**